## In the United States Court of Appeals for the Eighth Circuit

DAVID MEZA,
*Plaintiff-Appellant,*

v.

UNION PACIFIC RAILROAD CO.,
*Defendant-Appellee.*
----------------------------------------------------

On Appeal from the United States District Court
for the District of Nebraska - Omaha
No. 8:22-cv-00102-RFR (The Hon. Robert R. Rossiter, Jr)

---

**BRIEF OF PLAINTIFF-APPELLANT**

---

James H. Kaster
Lucas J. Kaster
NICHOLS KASTER, PLLP
4700 IDS Center
80 S. 8th Street
Minneapolis, MN 55402
(612) 256-3200
kaster@nka.com
lkaster@nka.com

June 13, 2024                    *Counsel for Plaintiff-Appellant*

## SUMMARY OF THE CASE AND REQUEST FOR ORAL ARGUMENT

Meza's employer, Union Pacific, discriminated against him on the basis of disability when it imposed work restrictions that prevented Meza from returning to his job. Union Pacific issued the restrictions because it believed Meza's traumatic brain injuries posed an increased risk for future seizures, and Meza would be a safety risk if he were allowed to perform his job.

The question presented by this appeal is whether Union Pacific regarded Meza as disabled under the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.* ("ADA") when it issued work restrictions that prevented Meza from returning to his job. *See School Board of Nassau County v. Arline*, 480 U.S. 273 (1987). Argument will assist the Court in addressing this important legal issue. Plaintiff-Appellant respectfully requests 15 minutes of oral argument.

Appellate Case: 24-1367     Page: 2     Date Filed: 06/14/2024 Entry ID: 5403709

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Fed. R. App. P. 26.1, David Meza makes the following required disclosures:

1. Is said party a subsidiary or affiliate of a publicly owned corporation? **No.**

2. Is there a publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome? **No.**

Date: June 13, 2024         <u>s/Lucas J. Kaster</u>
                                  Lucas J. Kaster

Appellate Case: 24-1367    Page: 3    Date Filed: 06/14/2024 Entry ID: 5403709

# TABLE OF CONTENTS

SUMMARY OF THE CASE AND REQUEST FOR ORAL ARGUMENT ........... i

CORPORATE DISCLOSURE STATEMENT ...................................................... ii

TABLE OF CONTENTS ...................................................................................... iii

TABLE OF AUTHORITIES ............................................................................... v

INTRODUCTION ................................................................................................ 1

JURISDICTIONAL STATEMENT .................................................................... 4

STATEMENT OF THE ISSUE ........................................................................... 4

STATEMENT OF THE CASE ............................................................................ 5

    A.   Meza works ably for Union Pacific for two decades. .................................. 5

    B.   Meza suffers an off-duty motorcycle accident. ............................................. 6

    C.   Meza is symptom-free and cleared to return to work without restrictions by five separate medical providers. .................................................................. 8

    D.   Union Pacific ignores the treating doctors' releases and instead imposes broad work restrictions because it believes that Meza's traumatic brain injuries put him at an increased risk for seizures based on defunct guidance from a separate industry. ......................................................................................12

    E.   The FMCSA's Medical Examiner Handbook does not apply to the railroad industry, and the FMCSA determined that the Handbook was outdated and "No Longer in Use" as of 2015. .................................................................16

    F.   Union Pacific was aware that the FMCSA had removed the 2014 Handbook from use but continued to rely upon the defunct guidance when making fitness for duty determinations. ..............................................................................19

Appellate Case: 24-1367    Page: 4    Date Filed: 06/14/2024 Entry ID: 5403709

SUMMARY OF ARGUMENT ...........................................................21

STANDARD OF REVIEW .................................................................23

ARGUMENT....................................................................................23

I.   Under the ADAAA, Union Pacific regarded Meza as disabled. .................23

   a.   In 2008, Congress broadened the "regarded as" provision to cover plaintiffs like Meza. ...............................................................23

   b.   The record presents a triable issue whether Union Pacific regarded Meza as disabled under the ADAAA................................................30

II.   The district court's contrary logic contradicts Congress's clear intent and distorts the regarded as definition beyond all recognition...........................36

   a.   The district court relied on a flawed understanding of the "regarded as" element. .................................................................37

   b.   The district court ignored Union Pacific's admissions and drew inferences from the record in Union Pacific's favor. ............................41

   c.   The district court's reliance on *Morriss* and *Jackson* is misplaced. ........43

CONCLUSION ...............................................................................46

CERTIFICATE OF COMPLIANCE....................................................48

CERTIFICATE OF SERVICE............................................................49

Appellate Case: 24-1367   Page: 5   Date Filed: 06/14/2024 Entry ID: 5403709

# TABLE OF AUTHORITIES

**Cases:**

*Adair v. City of Muskogee*, 823 F.3d 1297 (10th Cir. 2016) ..................................29

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242 (1986) ..........................................41

*Andrews v. Koch Foods of Pine Mountain Valley, LLC*, No. 4:18-CV-16 (CDL), 2019 WL 13301152 (M.D. Ga. May 10, 2019) ...................................33

*Bingham v. Union Pac. R.R.*, No. 8:22-CV-118, 2023 WL 6196875 (D. Neb. Sept. 22, 2023)..................................................................................................3, 43

*Brasier v. Union Pac. R.R. Co.*, No. CV-21-00065-TUC-JGZ (MSA), 2023 WL 129534 (D. Ariz. Jan. 9, 2023)...............................................................33

*Brunko v. Mercy Hosp.*, 260 F.3d 939 (8th Cir. 2001).............................................23

*Canning v. Creighton Univ.,* 995 F.3d 603 (8th Cir. 2021) ...................................38

*Cannon v. Jacobs Field Servs. N. Am., Inc.*, 813 F.3d 586 (5th Cir. 2016)...........29

*Cole v. Weatherford Int'l, LLC*, No. 14-CV-1115-WJM-KMT, 2015 WL 3896835 (D. Colo. June 23, 2015)...............................................................33

*Conant v. City of Hibbing*, 271 F.3d 782 (8th Cir. 2001) ......................................24

*E.E.O.C. v. Am. Tool & Mold, Inc.*, 21 F. Supp. 3d 1268 (M.D. Fla. 2014).....32, 38

*E.E.O.C. v. LHC Grp., Inc.*, 773 F.3d 688 (5th Cir. 2014) ....................................29

*Equal Employment Opportunity Comm'n v. Amsted Rail Co., Inc.*, 280 F. Supp. 3d 1141 (S.D. Ill. 2017) .............................................................29, 33, 36

*Eshleman v. Patrick Indus., Inc.*, 961 F.3d 242 (3d Cir. 2020).............................28

*Finan v. Good Earth Tools, Inc.*, No. 4:06-CV-878-CAS, 2008 WL 1805639 (E.D. Mo. Apr. 21, 2008), *aff'd,* 565 F.3d 1076 (8th Cir. 2009) ...................................32

Appellate Case: 24-1367    Page: 6    Date Filed: 06/14/2024 Entry ID: 5403709

Fischer v. Minneapolis Pub. Sch., 792 F.3d 985 (8th Cir. 2015) .....................45, 46

*Harris v. Union Pac. R.R. Co.*, 953 F.3d 1030 (8th Cir. 2020).............................25

*Huggins v. Stryker Corp.*, 932 F. Supp. 2d 972 (D. Minn. 2013)..........................41

*Jackson v. Union Pac. R.R.*, No. 419-cv-00069-RGE-RAW, 2021 WL 1726895 (S.D. Iowa Mar. 29, 2021) ...............................................................3, 43, 45, 46

*Lewis v. City of Union City, Georgia*, 934 F.3d 1169 (11th Cir. 2019)...........passim

*Maitland v. Univ. of Minn.*, 155 F.3d 1013 (8th Cir. 1998) ...................................41

*Mercado v. Puerto Rico*, 814 F.3d 581 (1st Cir. 2016)..........................................29

*Mesa v. City of San Antonio by & through City Pub. Serv. Bd.*, No. SA-17-CV-654-XR, 2018 WL 3946549 (W.D. Tex. Aug. 16, 2018) .............................29, 33

*Milligan v. Rambosk*, No. 220-cv-403-FtM-29MRM, 2022 WL 562342 (M.D. Fla. Feb. 24, 2022), *reconsideration denied*, No. 220-cv-403-FtM-29MRM, 2022 WL 910057 (M.D. Fla. Mar. 29, 2022) ......................................................................32

*Morriss v. BNSF Railway Co.*, 817 F.3d 1104 (8th Cir. 2016) .............3, 37, 43, 44

*Nall v. BNSF Ry. Co.*, 917 F.3d 335 (5th Cir. 2019)......................................passim

*Neely v. PSEG Texas, Ltd. P'ship*, 735 F.3d 242 (5th Cir. 2013) ....................24, 25

*Nunies v. HIE Holdings, Inc.*, 908 F.3d 428 (9th Cir. 2018)..................................29

*Parker v. Crete Carrier Corp.*, 839 F.3d 717 (8th Cir. 2016)................................26

*Sanders v. Union Pac. R.R. Co.*, No. 4:20-cv-3023, 2021 WL 4783629 (D. Neb. Oct. 7, 2021) .....................................................................................................32

*School Board of Nassau County v. Arline*, 480 U.S. 273 (1987) ...................passim

*Smart v. DeKalb Cnty., Georgia*, No. 1:16-CV-826-WSD, 2018 WL 1089677 (N.D. Ga. Feb. 26, 2018).....................................................................................33

Appellate Case: 24-1367    Page: 7    Date Filed: 06/14/2024 Entry ID: 5403709

*Sutton v. United Air Lines, Inc.,* 527 U.S. 471, 119 S. Ct. 2139, 144 L.Ed.2d 450 (1999) ........................................................................................23, 24, 26, 37

*United States v. Fitzgerald*, 906 F.3d 437 (6th Cir. 2018) .....................................40

*United States v. Turkette,* 452 U.S. 576 (1981) ....................................................40

*Wealot v. Brooks*, 865 F.3d 1119 (8th Cir. 2017) .................................................23

**Other Authorities:**

87 FR 50282 ...........................................................................................................19

**Rules, Statues, Regulations:**

28 U.S.C. § 1291.................................................................................................... 4

28 U.S.C. § 1331.................................................................................................... 4

29 C.F.R. § 1630.2(g)(1)........................................................................................23

29 C.F.R. § 1630.2(h)(1)-(2) .................................................................................26

29 C.F.R. § 1630.2(*l*)(1)....................................................................................25, 26

29 C.F.R. § 1630.2(l)(3).........................................................................................36

29 C.F.R. § Pt. 1630...........................................................................................25, 26

29 C.F.R. § Pt. 1630 App. Section 1630.2(l).............................................28, 29, 38

29 C.F.R. 1630.2(r)................................................................................................40

42 U.S.C. § 12101 *et seq*.................................................................................... i, 4

42 U.S.C. § 12102(1) ........................................................................................23, 26

42 U.S.C. § 12102(1)(A)........................................................................................24

Appellate Case: 24-1367     Page: 8     Date Filed: 06/14/2024 Entry ID: 5403709

42 U.S.C. § 12102(1)(C) .................................................................5, 26

42 U.S.C. § 12102(3)(A) ....................................................... 1, 5, 25, 38

42 U.S.C. § 12111(3) ............................................................................40

42 U.S.C. § 12112(a) .....................................................................5, 26

ADA Amendments Act of 2008, Pub. L. No. 110-325, § 2(b)(3), 122 Stat. 3553 ....................................................................................................passim

ADA Amendments Act of 2008, Pub. L. No. 110-325, § 2(b)(5), 122 Stat. 3553..... ................................................................................................25

Fed. R. App. P. 26.1........................................................................ ii

Federal Rules of Appellate Procedure 4(a)(1)(A) ..................................... 4

## **INTRODUCTION**

The district court granted summary judgment for one reason—it held that Appellant David Meza ("Meza") failed to show that he was "regarded as" disabled.

According to the ADA Amendments Act of 2008 ("ADAAA"), an employee is "regarded as" disabled if the employer discriminates against him "because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity." 42 U.S.C. § 12102(3)(A). Under this broad definition, an employer that takes an adverse action because it believes the employee's medical condition poses a safety risk regards the individual as disabled. *School Board of Nassau County v. Arline*, 480 U.S. 273, 282-86 (1987); *Lewis v. City of Union City, Georgia*, 934 F.3d 1169, 1181-82 (11th Cir. 2019); *Nall v. BNSF Ry. Co.*, 917 F.3d 335, 342-49 (5th Cir. 2019).

Here, Union Pacific admits that it removed Meza from work and imposed work restrictions that kept him from returning to his job because it believed the traumatic brain injuries and hemorrhages that Meza suffered from a motorcycle accident posed an unacceptable safety risk. According to Union Pacific's doctors, Dr. John Holland and Dr. John Charbonneau, Meza's injuries caused permanent damage to his brain, and thus posed an unacceptable risk for future seizures.

Neither Dr. Holland nor Dr. Charbonneau are neurologists, and neither examined nor spoke to Meza prior to issuing the work restrictions. Dr. Holland and

1

Dr. Charbonneau also ignored the opinions of five treating medical providers, including two neurologists, each of whom released Meza to return to work with no restrictions. Instead, Dr. Holland and Dr. Charbonneau relied on the defunct Medical Examiner's Handbook from the Federal Motor Carrier Safety Administration ("FMCSA"), which governs the commercial trucking industry. The FMCSA's Medical Examiner Handbook does not apply to the railroad industry, makes no mention of work restrictions like the ones imposed by Dr. Holland and Dr. Charbonneau, and was designated as "No Longer in Use" by the FMCSA as of 2015 because much of the medical information was obsolete.

Despite this record, the district court found that Meza failed to raise a triable issue whether Union Pacific regarded Meza as disabled at the time it issued the work restrictions. The errors in the district court's rationale are three-fold.

First, the district court relied on a flawed understanding of the "regarded as" definition, fashioning an imagined distinction between Meza's medical conditions and the alleged safety concerns resulting from those conditions. In 2008, Congress broadened the definition of "regarded as" under the ADA, specifically recognizing that the safety-related effects of a medical condition are no different than the condition itself. ADA Amendments Act of 2008, Pub. L. No. 110-325, § 2(b)(3), 122 Stat. 3553; *Arline*, 480 U.S. at 282-86. Thus, an employer that takes an adverse action against an employee believing that the employee's medical condition poses a

2

safety risk has regarded the individual as disabled. *Arline*, 480 U.S. at 282-86; *Lewis,* 934 F.3d at 1181-82; *Nall,* 917 F.3d at 342-49.

Second*,* the district court violated the basic summary judgment principle that the court must view the record and draw all reasonable inferences in favor of the non-moving party. Instead of abiding by this rule, the district court overlooked Union Pacific's plain admissions that it removed Meza from service because it believed his medical condition posed a safety risk and instead drew inferences from the record in Union Pacific's favor.

Third*,* the district court relied on outdated case law or cases that bear little resemblance to the present case. For example, the district court relied heavily on this Court's decision in *Morriss v. BNSF Railway Co.*, 817 F.3d 1104 (8th Cir. 2016). *Morriss* addressed an entirely separate legal question and is factually distinct from the present case. As such, it has no bearing on the issue presented here.

The district court's reliance on two other district court opinions, *Jackson v. Union Pac. R.R.*, No. 419-cv-00069-RGE-RAW, 2021 WL 1726895 (S.D. Iowa Mar. 29, 2021) and *Bingham v. Union Pac. R.R.*, No. 8:22-CV-118, 2023 WL 6196875, at *13 (D. Neb. Sept. 22, 2023) fares no better. Like the district court here, those decisions rest on an understanding of the regarded-as element that was specifically rejected by Congress when it amended the ADA in 2008.

3

For these reasons, the district court's flawed conclusion that Meza was not regarded as disabled as a matter of law is wrong and should be reversed.

## JURISDICTIONAL STATEMENT

The district court had subject-matter jurisdiction under 28 U.S.C. § 1331 because this action arises under the federal Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.* ("ADA"). App. Vol. 1, at 001-015, R. Doc. 1, 1-15.

This is an appeal from the district court's order of January 26, 2024, which granted defendant's motion for summary judgment. Add. 1-19, App. Vol. 17, at 3545-3563, R. Doc. 162, at 1-19. The district court's order disposed of all claims and judgment was entered in favor of Union Pacific. Add. 1-19, App. Vol. 17, at 3545-3563, R. Doc. 162, at 1-29; Add. 20, App. Vol. 17, at 3564, R. Doc. 163, at 1. This Court has jurisdiction over the appeal pursuant to 28 U.S.C. § 1291. Meza timely filed a notice of appeal under Federal Rules of Appellate Procedure 4(a)(1)(A) on February 21, 2024. *See* App. Vol. 17, at 3565, R. Doc. 164, at 1.

## STATEMENT OF THE ISSUE

Whether the district court erred when it held that plaintiff-appellant David Meza failed to raise a triable issue whether he was regarded as disabled under the Americans with Disabilities Act and, as a result, granted Appellee Union Pacific Railroad Company's motion for summary judgment.

4

Apposite cases on this issue include *School Board of Nassau County v. Arline*, 480 U.S. 273, 282-86 (1987), *Lewis v. City of Union City, Georgia*, 934 F.3d 1169, 1181-82 (11th Cir. 2019), and *Nall v. BNSF Ry. Co.*, 917 F.3d 335, 342-49 (5th Cir. 2019). Apposite statutory provisions include 42 U.S.C. §§ 12101, 12102(1)(C), (3)(A) and 12112(a). There are no apposite constitutional provisions.

## STATEMENT OF THE CASE

**A.     Meza works ably for Union Pacific for two decades.**

In 1996, Meza was hired by Southern Pacific Railroad as a carman. App. Vol. 7, at 1303, R. Doc. 150-16, at 14:15-17[1]. Soon thereafter, Union Pacific purchased and merged with Southern Pacific, and Meza became an employee of Union Pacific. App. Vol. 7, at 1303, R. Doc. 150-16, at 14:18-21.

During his twenty-year career with Union Pacific, Meza worked in West Colton, California as a Car Inspector, Carman Welder, Lead Carman, Carman FRT Welder, and FRT Carman. App. Vol. 15, at 3191-93, R. Doc. 153-05, at 2-4. Meza's managers in West Colton, Paul Friend and Phillip Stanley, had no concerns about Meza's ability to perform his job and believed he was a good employee. App. Vol. 7, at 1392, R. Doc. 150-16, at 103:11-14; App. Vol. 8, at 1503-05, 1570, R. Doc.

---

[1] For citations to deposition transcripts, the citation is to the page and line of the deposition instead of the ECF page number. For all other record citations, the citation is to the ECF page number.

5

150-17, at 11:16-12:1, 12:15-25, 13:12-25, 78:16-17; App. Vol. 8, at 1617, 1634, R. Doc. 150-18, at 17:13-25, 34:16-24.

## B.  Meza suffers an off-duty motorcycle accident.

On June 18, 2016, Meza suffered an off-duty motorcycle accident. App. Vol. 6, at 1131, R. Doc. 150-05 at 4; App. Vol. 7, at 1335, R. Doc. 150-16, at 46:21-23. Meza was thrown from his motorcycle and lost consciousness for approximately two minutes. App. Vol. 6, at 1131, R. Doc. 150-05, at 4; App. Vol. 15, at 3057, R. Doc. 153-04, at 106 ("Pt had return of pulse and responsiveness after about two minutes."); App. Vol. 15, at 3221, R. Doc. 153-07, at 2 (Meza was "revived after about two minutes. . . ."); App. Vol. 9, at 1859-61, R. Doc. 150-20, at 83:13-85:6. Meza's loss of consciousness was likely "due to cardiac arrest[,]" rather than head trauma. App. Vol. 9, at 1877-78, R. Doc. 150-20, at 101:21-102:22. Meza regained consciousness and had a Glasgow Coma Scale[2] of 14 while on scene. App. Vol. 15, at 3063, 3067, R. Doc. 153-04, at 112, 116 ("Chest compressions and CPR was started and within a few minutes he aroused. He was found by EMS as GCS 14.").

---

[2] The Glasgow Coma Scale is a used to "objectively describe the extent of impaired consciousness in all types of acute medical and trauma patients." *See* National Library of Medicine, available at: https://www.ncbi.nlm.nih.gov/books/NBK513298/, last visited on Oct. 30, 2023. It is "widely used to guide early management of patients with a head injury or other kind of acute brain injury." *Id.* The scale ranges from 3 to 15, with 3 being the worst injury and 15 being the mildest. *Id.*

Appellate Case: 24-1367     Page: 15     Date Filed: 06/14/2024 Entry ID: 5403709

A Glascow Coma Scale score of 14 "is almost completely normal." App. Vol. 9, at 1859-60, R. Doc. 150-20, at 83:18-84:2.

After Meza regained consciousness, he was taken by ambulance to Riverside Community Hospital in Riverside, California. App. Vol. 7, at 1342, R. Doc. 150-16, at 53:11-13; App. Vol. 15, at 2976, R. Doc. 153-04, at 25. When Meza arrived at the hospital, he had a Glasgow Coma Scale of 15, which is the best possible score. App. Vol. 15, at 3067, R. Doc. 153-04, at 116.

Meza was in the Riverside Community Hospital from June 18 until June 26. App. Vol. 7, at 1343, R. Doc. 150-16, at 54:19-22; App. Vol. 15, at 3055, R. Doc. 153-04, at 104. While at Riverside, Meza was diagnosed with an intracerebral bleed due to trauma, a basilar skull fracture, hemotympanum of the left ear, and a left pulmonary contusion. App. Vol. 15, at 3072; R. Doc. 153-04, at 121. To monitor the intracranial bleed, Meza had five CT scans at Riverside. App. Vol. 15, at 3088-98; R. Doc. 153-04, at 137-47. The final CT scan on June 25, 2016, showed that the intracranial bleed was "stable." App. Vol. 15, at 3088, R. Doc. 153-04, at 137.

On June 26, the doctors at Riverside "cleared [Meza] for discharge home." App. Vol. 15, at 3056, R. Doc. 153-04, at 105. At the time of discharge, the doctors noted that the intracranial hemorrhage "improve[d]" and was "stable." App. Vol. 15, at 3056, R. Doc. 153-04, at 105. Meza was advised to follow up with his primary

Appellate Case: 24-1367    Page: 16    Date Filed: 06/14/2024 Entry ID: 5403709

care physician in four to six weeks and that he was to be off work for six weeks. App. Vol. 15, at 3055-56, R. Doc. 153-04, at 104-05.

## C. Meza is symptom-free and cleared to return to work without restrictions by five separate medical providers.

In the months after the accident, Meza received medical care from several providers, including two neurologists. *See* App. Vol. 15, at 2992-3117, 3157-3161, R. Doc. 153-04, at 41-167, 206-10.

After being released from Riverside, Meza sought treatment from Dr. Robert Klein, a neurologist at the BMG Banning Specialty Care Center – Neurology, in Banning, California. App. Vol. 15, at 3032, R. Doc. 153-04, at 81; App. Vol. 13, at 2613, R. Doc. 150-25, at 11:9-19. At the time, Dr. Klein had over forty years of experience as a neurologist and was a Diplomate in Neurology at the American Board of Psychiatry and Neurology. App. Vol. 13, at 2613, 2615, 2654, R. Doc. 150-25, at 11:9-22, 13:20-23, 52:7-14.

In his practice, Dr. Klein regularly evaluated patients to determine whether they were safe to return to work. App. Vol. 13, at 2616-17, R. Doc. 150-25, at 14:22-15:6. Dr. Klein performed such exams for patients in many different industries, including railroad workers. App. Vol. 13, at 2617, R. Doc. 150-25, at 15:7-14. As a result, Dr. Klein understood that the railroad industry can be dangerous, and that railroad employees are "working around moving trains, moving railroad cars, [and] heavy equipment." App. Vol. 13, at 2617-18, R. Doc. 150-25, at 15:24-16:17.

8

Meza visited Dr. Klein four separate times, on July 26, 2016, August 17, 2016, September 14, 2016, and January 12, 2017. App. Vol. 15, at 3032-46, R. Doc. 153-04, at 81-95. During each visit, Dr. Klein performed a physical examination of Meza and assessed Meza's recovery from the accident. *See* App. Vol. 15, at 3032-46, R. Doc. 153-04, at 81-95. Following the first visit on July 26, 2016, Dr. Klein also ordered an MRI. App. Vol. 13, at 2629, R. Doc. 150-25, at 27:17-24, App. Vol. 15, at 3045, R. Doc. 153-04, at 94. The MRI was performed on August 9, 2016. App. Vol. 15, at 3033-35, R. Doc. 153-04, at 82-84. Dr. Klein found that the MRI showed "no specific or acute intracranial abnormality" and "[n]o specific brain parenchymal abnormality[.]" App. Vol. 15, at 3033, R. Doc. 153-04, at 82. In particular, the MRI showed "no hemorrhage . . . no mass effect . . . no edema . . . no extra-axial fluid . . . . [and] no specific or unusual enhancement[.]" App. Vol 15, at 3033, R. Doc. 153-04, at 82. The only finding was "a small amount of fluid in the left mastoid air cells." App. Vol. 15, at 3033, R. Doc. 153-04, at 82.

During the visit on January 12, 2017, Dr. Klein determined that Meza "made a full recovery." App. Vol. 15, at 3032, R. Doc. 153-04, at 81. Dr. Klein noted that Meza's neurological exam was "normal" and the Hallpike test for dizziness was "negative." App. Vol. 15, at 3032, R. Doc. 153-04, at 81. Accordingly, Dr. Klein determined that Meza could "return to work on February 1, 2017, and resume his regular job duties." App. Vol. 15, at 3032, R. Doc. 153-04, at 81. When providing

9

the medical release for Meza, Dr. Klein considered Meza's specific job duties, and what he understood a railroad employee would do while working in a railroad yard. App. Vol. 13, at 2637, R. Doc. 150-25, at 35:8-22.

Meza also sought treatment from Dr. Pantea Zohrevand, a neurologist and epileptologist with a focus on neurophysiology and epilepsy. App. Vol. 13, at 2697-98, 2742-43, R. Doc. 150-26, at 10:3-14, 11:3-7, 55:8-56:12. At the time she treated Meza, Dr. Zohrevand was an assistant professor of neurology at Loma Linda University. *See* App. Vol. 13, at 2742-43, R. Doc. 150-26, at 55:8-56:12. In her practice, Dr. Zohrevand often provides her opinion about whether an employee is safe to return to work considering their neurological condition. App. Vol. 13, at 2700-02, R. Doc. 150-26, at 13:8-15:2. This includes providing an opinion about whether a patient's risk for seizure is too high to allow the person to work. App. Vol. 13, at 2701, R. Doc. 150-26, at 14:12-18.

On June 19, 2017, following her testing and examinations of Meza, Dr. Zohrevand determined that Meza was "safe to drive and resume his work with *no restriction*." App. Vol. 16, at 3314, 3319-20, R. Doc. 153-16, at 49, 54-55 (emphasis added). Dr. Zohrevand would not have released Meza to return to work if she felt that he was unsafe. App. Vol. 13, at 2749, R. Doc. 150-26, at 62:6-8. On July 3, 2017, Meza forwarded the release to Union Pacific. *See* App. Vol. 15, at 3179, R. Doc. 153-04, at 228; *see also* App. Vol. 15, at 3229, R. Doc. 153-08, at 7 ("EE

10

submitted a letter requesting reconsideration of the 5-year restrictions and note to RTW-no restrictions from his Neurologist.").

Meza also sought treatment from Dr. Katrina Platt, his primary care physician at Redwoods Community Hospital in Redlands, California. App. Vol. 7, at 1353, R. Doc. 150-16, at 64:14-22; App. Vol. 15, at 2979-80, R. Doc. 153-04, at 28-29. Dr. Platt is a Doctor of Osteopathic Medicine and a Medical Examiner with the Federal Aviation Administration ("FAA"). App. Vol. 15, at 3158, R. Doc. 153-04, at 207. On March 13, 2017, following her treatment of Meza in the months following the accident, Dr. Platt issued Meza a medical release to return to work with no restrictions as of that date. App. Vol. 15, at 3158, R. Doc. 153-04, at 207. Meza forwarded the release from Dr. Platt to Union Pacific along with the previous release from Dr. Klein, stating "I need to get back to work." App. Vol. 15, at 3157-60, R. Doc. 153-04, at 206-09.

Meza also received treatment from physical therapist, Lisa Marie Zidek, MPT, PT. App. Vol. 15, at 2994-3031, R. Doc. 153-04, at 43-80. Zidek performed neurological physical therapy related to Meza's traumatic brain injury ("TBI") to help improve Meza's physical functioning. App. Vol. 15, at 3031, R. Doc. 153-04, at 80. After the final therapy session in November 2016, Zidek found that Meza was "free of symptoms," was "able to balance in all conditions" without loss of balance

11

and did not have an increased risk of falling. App. Vol. 15, at 2998, R. Doc. 153-04, at 47.

Finally, Meza visited chiropractor Michael Monahan, DC. App. Vol. 7, at 1350, 1352, R. Doc. 150-16, at 61:8-20; 63:6-15; App. Vol. 15, at 3047-51, R. Doc. 153-04, at 96-100. Following his treatments of Meza, Monahan cleared Meza to return to work with no restrictions on January 19, 2017. App. Vol. 15, at 3048, R. Doc. 153-04, at 97. Meza also provided this release to Union Pacific. App. Vol. 15, at 3157-60, R. Doc. 153-04, at 206-09.

**D.  Union Pacific ignores the treating doctors' releases and instead imposes broad work restrictions because it believes that Meza's traumatic brain injuries put him at an increased risk for seizures based on defunct guidance from a separate industry.**

After his accident, Union Pacific required Meza to provide complete medical records regarding the accident and to go through a fitness for duty review. App. Vol. 15, at 3238, R. Doc. 153-8, at 16 ("WILL REQUIRE RTW EXAM."). Meza provided the requested records, which were reviewed by Union Pacific's then-Associate Medical Director, Dr. John Charbonneau, and then-Chief Medical Officer, Dr. John Holland. *See* App. Vol. 15, at 2992-3117, R. Doc. 153-08, at 41-166; *see also* App. Vol. 15, at 3221-3222, R. Doc. 153-07, at 2-3; App. Vol. 15, at 3233-34, R. Doc. 153-08, at 11-12; App. Vol. 16, at 3253-55, R. Doc. 153-12, at 2-4.

Dr. Charbonneau and Dr. Holland are not neurologists. App. Vol. 11, at 2212-13, R. Doc. 150-22, at 35:16-36:9; App. Vol. 10, at 1995, R. Doc. 150-21, at 10:5-

12

7. Prior to issuing their fitness for duty determination, Dr. Charbonneau and Dr. Holland never physically examined Meza, never spoke with any of Meza's treating providers, including neurologists Dr. Klein and Dr. Zohrevand, and never sought an opinion from an outside neurologist or epileptologist. App. Vol. 11, at 2215, 2232, 2268-69, 2286-87, R. Doc. 150-22, at 38:18-24, 55:16-18, 91:4-92:2, 109:16-110:13; App. Vol. 10, at 2008, 2052-53, 2059-60, 2065-66, R. Doc. 150-21, at 23:8-18, 67:20-68:11, 74:13-75:19, 80:18-25; *see also* App. Vol. 15, at 3221-3222, R. Doc. 153-07, at 2-3; App. Vol. 15, at 3233-34, R. Doc. 153-08, at 11-12; App. Vol. 16, at 3247-48, R. Doc. 153-11, at 2-6; App. Vol. 16, at 3253-55, R. Doc. 153-12, at 2-4. Dr. Holland and Dr. Charbonneau also never spoke with Meza's supervisors to understand his job responsibilities in West Colton. *See* App. Vol. 8, at 1532, 1534-35, R. Doc. 150-17, at 40:14-24, 42:24-43:9; App. Vol. 8, at 1643, R. Doc. 150-18, at 43:8-13; App. Vol. 11, at 2217-18, 2253, 2287, R. Doc. 150-22, at 40:12-41:3, 76:8-16, 110:14-16.

On February 15, 2017, following his review of Meza's medical records, Dr. Charbonneau issued an initial fitness for duty determination for Meza. App. Vol. 15, at 3235, R. Doc. 153-08, at 13; App. Vol. 15, at 3240-43, R. Doc. 153-09, at 2-5. Dr. Charbonneau stated that "[d]ue to the nature and severity of his traumatic brain injury with intraparenchymal hemorrhagic contusions the EE will require sudden incapacitation restrictions for a period of 5 years." App. Vol. 15, at 3235, R. Doc.

13

153-08, at 13. According to Dr. Charbonneau, areas in Meza's brain were "altered chemically," and thus could be a source of seizure activity in the future.[3] App. Vol. 6, at 1135, R. Doc. 150-05, at 8. For that reason, Dr. Charbonneau stated that "[m]oderate to severe traumatic brain injuries with intraparenchymal hemorrhages are associated with an unacceptably high risk of additional neurologic episodes, including seizures, for a period of five years," and issued restrictions as a result. App. Vol. 15, at 3240-43, R. Doc. 153-09, at 2-5.

The restrictions were as follows:

(1)     Not to operate company vehicles, on-track or mobile equipment, or fork-lifts. (Clarification: not to operate golf carts, ATVs, etc.)

(2)     Not to work on or near moving trains, freight cars, or locomotives, unless protected by barriers. (Clarification: May work on stationary locomotives outside of the blue flag zone, if working with another employee and following normal safety rules.)

(3)     Not to operate cranes, hoists, or machinery, if these activities might create a risk of harm to others or a risk of catastrophic injury to the employee.

(4)     Not to work at unprotected heights over 4 feet above the ground. (Clarification: May ascend stairs and ladders on locomotives in shops, following normal safety rules).

(5)     If a new job assignment is considered, then HMS should review the functional job demands to determine if the employee can safely perform the essential functions of the job.

---

[3] Meza never had a seizure before or after his accident. App. Vol. 16, at 3442-45; R. Doc. 153-21, at 3-6.

14

(6)     Not to perform work where decisions or actions can affect the safety of others, or have a significant impact on business operations.

(7)     Not to perform work involving active control of trains or equipment (e.g. Train Dispatcher or Yard Master positions).

(8)     These work restrictions shall remain in place until at least 6/18/2021 and then can be reassessed.

App. Vol. 15, at 3242, R. Doc. 153-09 at 4.

Dr. Charbonneau made this determination in less than one day. *See* App. Vol. 15, at 3235, R. Doc. 153-08, at 13. Dr. Charbonneau cited no scientific studies or literature to support the restrictions. App. Vol. 15, at 3240-43, R. Doc. 153-09, at 2-5. Instead, he referred to the FMCSA's 2014 Medical Examiner Handbook. *See* App. Vol. 15, at 3222, R. Doc. 153-07 at 3; App. Vol. 15, at 3242, R. Doc. 153-09, at 4.

On March 2, 2016, Dr. Holland issued the final fitness for duty determination for Meza. App. Vol. 16, at 3247-49, R. Doc. 153-11, at 2-4; App. Vol. 15, at 3233-34, R. Doc. 153-08, at 11-12. According to Dr. Holland, the restrictions were necessary because he believed that Meza was at an increased risk for future seizures due to "permanent damage" to his brain, including dead brain tissue and scarring. App. Vol. 10, at 2119-20, R. Doc. 150-21 at 134:6-135:11.

Like Dr. Charbonneau, Dr. Holland made his determination in less than one day and cited no scientific studies or literature to support the restrictions. *See* App. Vol. 10, at 2007-08, R. Doc. 150-21, at 22:15-23:7; *see also* App. Vol. 15, at 3233-

34, R. Doc. 153-08, at 11-12; App. Vol. 16, at 3247-49, R. Doc. 153-11, at 2-4. Instead, Dr. Holland stated that Meza "fit within the category covered in the FMCSA Medical [] Handbook" and it was Union Pacific's practice to apply the recommendation from the Handbook to "people with intracerebral hemorrhages." App. Vol. 10, at 2008-09, R. Doc. 150-21, at 23:19-24:21.

Following the fitness for duty determination, Dr. Holland signed a Railroad Retirement Board document certifying that "David Meza has been disabled from performing his/her regular occupation from June 18, 2016 to June 18, 2021 due to . . . TBI – Skull Fx." App. Vol. 15, at 3145, R. Doc. 153-04 at 194.

**E.     The FMCSA's Medical Examiner Handbook does not apply to the railroad industry, and the FMCSA determined that the Handbook was outdated and "No Longer in Use" as of 2015.**

The FMCSA's 2014 Medical Examiner Handbook was created as a guide for certified medical examiners in the commercial trucking industry. *See* App. Vol. 5, at 871, R. Doc. 150-03, at 9. The Handbook provided guidance to the medical examiners when deciding whether to certify an applicant for a commercial drivers' license. *See* App. Vol. 5, at 871, R. Doc. 150-03, at 9. The Handbook does not apply to the railroad industry and provides no guidance for imposing work restrictions other than commercial driving certification. *See* App. Vol. 5, at 865-86, R. Doc. 150-03, at 3-24; App. Vol. 11, at 2203-05, R. Doc. 150-22, at 26:23-28:1; 103:9-18.

16

Union Pacific's retained expert, Dr. Brian Morris, explained that it was *only* reasonable for FMCSA certified medical examiners in the commercial trucking industry to use the Handbook as guidance. *See* App. Vol. 6, at 1175, R. Doc. 150-07, at 2; *see also* App. Vol. 6, at 1183-84, R. Doc. 150-08, at 6-7; App. Vol. 13, at 2836-37, R. Doc. 150-27, at 54:17-55:13. Dr. Morris had no opinion about whether it was reasonable for companies outside of the commercial driving industry, like Union Pacific, to rely on the 2014 Handbook. *See* App. Vol. 13, at 2837, R. Doc. 150-27, at 55:8-13.

As of 2015, the FMCSA said the 2014 Medical Examiner Handbook was "no longer in use" and removed it from the section of the FMCSA website that listed guidance for certified medical examiners. App. Vol. 5, at 865, R. Doc. 150-03, at 3; App. Vol. 13, at 2814-15, 2829, R. Doc. 150-27, at 32:14-33:1, 47:1-22. The FMCSA placed "As of 2015 this Handbook is no longer in use" on the front of the 2014 version because they did not "want people to go online, download it and think they should be using the guidelines in that [Medical Examiner Handbook] as if it had not been pulled from the Internet." App. Vol. 13, at 2823, R. Doc. 150-27, at 41:9-22.

To make this clear, the FMCSA also placed a watermark on each page of the 2014 handbook:

Appellate Case: 24-1367    Page: 26    Date Filed: 06/14/2024 Entry ID: 5403709



App. Vol. 5, at 865, R. Doc. 150-03, at 3.

According to Dr. Morris, much of the medical information in the Handbook was outdated because it was gathered from medical experts as far back as the 1980s. App. Vol. 13, at 2820-21, R. Doc. 150-27, at 38:5-39:8. Dr. Morris explained that the FMCSA removed the 2014 Handbook from its website because certified medical examiners were treating the Handbook as mandatory (regulation) versus optional (guidance), and because the FMCSA wanted to update the medical information. App. Vol. 13, at 2820-21, R. Doc. 150-27, at 38:5-39:8; App. Vol. 6, at 1180, R.

Appellate Case: 24-1367    Page: 27    Date Filed: 06/14/2024 Entry ID: 5403709

Doc. 150-08, at 3; *see also* 87 FR 50282 ("In 2015, FMCSA withdrew the [Medical Examiner Handbook ("MEH")] because some of the information was obsolete or was prescriptive in nature. [Medical Examiners] and training organizations were informed that the MEH was no longer in use and that they should not consider the MEH as Agency guidance.")

**F.      Union Pacific was aware that the FMCSA had removed the 2014 Handbook from use but continued to rely upon the defunct guidance when making fitness for duty determinations.**

Union Pacific was aware that the FMCSA removed the Handbook from its website as of at least September 2015. App. Vol. 14, at 2948, R. Doc. 153-02, at 2; App. Vol. 14, at 2951, R. Doc. 153-03, at 2; App. Vol. 10, at 2013, 2016-17, 2076-77, R. Doc. 150-21, at 28:10-15, 31:19-32:2, 91:24-92:9. Dr. Holland acknowledged that it was well-known within the occupational medicine field that the FMCSA removed the Handbook from its website. App. Vol. 10, at 2017-18, R. Doc. 150-21, at 32:6-33:11. Nevertheless, Dr. Holland continued to use the Handbook as a prescription for fitness for duty determinations for several more years. App. Vol. 14, at 2948-49, R. Doc. 153-02, at 2-3; App. Vol. 10, at 2016-17, R. Doc. 150-21, at 31:9-32:2; *see also* App. Vol. 15, at 3221-22, R. Doc. 153-07, at 2-3.

Moreover, Dr. Holland subjectively chose when to follow its guidance and when to deviate. For example, the Handbook mandates an in-person exam conducted by a certified medical examiner. *See* App. Vol. 5, at 887, R. Doc. 150-03, at 25; App.

19

Vol. 11, at 2194, R. Doc. 150-22, at 17:10-24. Under Dr. Holland's fitness for duty guidelines, no in-person examination was conducted by Union Pacific. App. Vol. 10, at 2003-05, R. Doc. 150-21, at 18:17-19:5. The Handbook also requires that the decision to certify an individual for a commercial drivers' license be made by a neutral, certified examiner. *See* App. Vol. 5, at 873-75, R. Doc. 150-03, at 11-13. Under Dr. Holland's fitness for duty guidelines, however, Union Pacific was the final decision-maker on whether an employee was fit for duty. *See* App. Vol. 2, at 422-24, R. Doc. 139-03, at 3-5; *see also* App. Vol. 15, at 3221-22, R. Doc. 153-07, at 2-3. The Handbook also provides no guidance about appropriate work restrictions other than driving a commercial vehicle. *See* App. Vol. 5, at 865-1124, R. Doc. 150-04, at 3-262. Dr. Holland and Union Pacific, however, used the Handbook as the sole basis to impose broad, standardized work restrictions that had no connection to commercial driving. *See* App. Vol. 14, at 2948-49, R. Doc. 153-02, at 2-3; *see also* App. Vol. 15, at 3221-22, R. Doc. 153-07, at 2-3

The standard work restrictions imposed by Dr. Holland and Union Pacific varied only according to an employee's work department and medical condition. *See* App. Vol. 6, at 1194-96, R. Doc. 150-10, at 2-4; *see also* App. Vol. 11, at 2251-54, R. Doc. 150-22, at 74:15-77:6. For example, if an employee worked in the mechanical department, like Meza, and Union Pacific believed they had a medical condition that presented a risk of sudden incapacitation, the employee received the

Appellate Case: 24-1367     Page: 29     Date Filed: 06/14/2024 Entry ID: 5403709

broad restriction "not to work on or near moving trains, freight cars or locomotives," among other restrictions. *See* App. Vol. 6, at 1194-96, R. Doc. 150-10, at 2-4; *see also* App. Vol. 11, at 2251-54, R. Doc. 150-22, at 74:15-77:6. This was true regardless of their position and duties within the department. *See* App. Vol. 6, at 1194-96, R. Doc. 150-10, at 2-4; *see also* App. Vol. 11, at 2251-54, R. Doc. 150-22, at 74:15-77:6

Other medical doctors expressed concern to Dr. Holland about the FMCSA Handbook and its reliability. *See* App. Vol. 16, at 3430, R. Doc. 153-18, at 3 ("I would not feel comfortable having my name attached as endorsing [Union Pacific's Fitness for Duty Guidelines]." "I need to balance risk, sensitivity to union and EEOC challenges and other factors which include current common practice in the community.").); *see also* App. Vol. 14, at 2944, R. Doc. 153-01, at 2 ("It appears the Handbook never underwent a broad-based peer-review process, if any at all.") Undaunted, Dr. Holland continued to rely on the Handbook, taking many people like Meza out of their jobs. *See* App. Vol. 2, at 422-24, R. Doc. 139-03, at 3-5; *see also* App. Vol. 15, at 3221-22, R. Doc. 153-07, at 2-3.

## SUMMARY OF ARGUMENT

In 2008, Congress amended the Americans with Disabilities Act, reinstating the broad definition of "regarded as" disabled laid out in *School Board of Nassau County v. Arline*, 480 U.S. 273 (1987). ADA Amendments Act of 2008, Pub. L. No.

110-325, § 2(b)(3), 122 Stat. 3553. In *Arline*, the Supreme Court clarified that there is no meaningful distinction between an impairment and its effects. 480 U.S. at 282-86. When an employer takes a prohibited action because of the safety-related effects of an impairment, the employer has regarded the individual as disabled. *Id.* For that reason, an employer that terminates an employee because it believes the employee's medical condition poses a safety risk has regarded the individual as disabled. *Id.*; *Lewis,* 934 F.3d at 1181-81; *Nall,* 917 F.3d at 342-49.

Despite this clear congressional intent, the district court held that Union Pacific's decision to remove Meza from service because it believed his traumatic brain injuries posed an increased risk for future seizures was insufficient to raise a triable issue whether Union Pacific regarded Meza as disabled. To reach this conclusion, the district court relied on a fundamentally flawed understanding of the "regarded as" element—one that was specifically overruled by Congress in 2008. The district court also misapprehended the record, all but ignoring the evidence establishing that Union Pacific believed that Meza had a current physical or mental impairment. Instead, the district court focused on Meza's subjective beliefs about his condition and relied on cases that have little bearing on the present issues, or that rely on reasoning specifically rejected by Congress in 2008. As such, the district court's opinion should be reversed.

Appellate Case: 24-1367     Page: 31     Date Filed: 06/14/2024 Entry ID: 5403709

This Court reviews a district court's grant of summary judgment de novo. *Wealot v. Brooks*, 865 F.3d 1119, 1124 (8th Cir. 2017). The movant bears the burden of proving that "there is no genuine despite as to any material fact and the movant is entitled to judgment as a matter of law." *Id.* At this stage, this Court views "the evidence in the light most favorable to the non-moving party."

## ARGUMENT

**I.     Under the ADAAA, Union Pacific regarded Meza as disabled.**

**a.     In 2008, Congress broadened the "regarded as" provision to cover plaintiffs like Meza.**

Under the ADA, an individual has a "disability" if they: (1) have a physical or mental impairment that substantially limits one or more major life activities; (2) have a record of such an impairment; or (3) are regarded as having such an impairment. 42 U.S.C. § 12102(1); 29 C.F.R. § 1630.2(g)(1). Prior to the ADAAA, a plaintiff was "regarded as" disabled only if the employer "mistakenly believed that [the employee] had a physical impairment that substantially limited one or major life activities," or the employer "mistakenly believed that [the employee] had an actual, nonlimiting impairment which substantially limited one or more major life activities." *Brunko v. Mercy Hosp.*, 260 F.3d 939, 942 (8th Cir. 2001) (citing *Sutton v. United Air Lines, Inc.,* 527 U.S. 471, 489, 119 S. Ct. 2139, 144 L.Ed.2d 450 (1999)

Appellate Case: 24-1367     Page: 32     Date Filed: 06/14/2024 Entry ID: 5403709

Under either scenario, the plaintiff was required to show that the employer "entertain[ed] misperceptions about the individual." *Conant v. City of Hibbing*, 271 F.3d 782, 785 (8th Cir. 2001) (*quoting Sutton,* 527 U.S. at 489.) Accordingly, prior to the amendments, a plaintiff was required to prove that the employer subjectively believed he was disabled—i.e. that he had a physical or mental impairment that substantially limited one or more of his major life activities, as defined under § 12102(1)(A)—and that the employer's subjective belief was wrong. *See Conant,* 271 F.3d at 785 (affirming summary judgment decision in favor of employer because the plaintiff offered "no evidence indicating that the [employer] perceived him as having an impairment that significantly restricted his ability to perform the major life activity of working.").

In 2008, in response to the courts' narrow interpretation of the "regarded as" provision, Congress passed the ADAAA, broadening the definition of "regarded as" and superseding the Supreme Court's analysis in *Sutton*. ADA Amendments Act of 2008, Pub. L. No. 110-325, § 2(b)(3), 122 Stat. 3553; *Neely v. PSEG Texas, Ltd. P'ship*, 735 F.3d 242, 245 (5th Cir. 2013). In crafting the ADAAA, Congress intended that the primary object of attention in ADA cases should be whether covered entities have complied with their obligations, and "the question of whether an individual's impairment is a disability under the ADA should not demand extensive analysis." *Harris v. Union Pac. R.R. Co.*, 953 F.3d 1030, 1040 (8th Cir.

Appellate Case: 24-1367     Page: 33     Date Filed: 06/14/2024 Entry ID: 5403709

2020) (Kelly, J., concurring) (*citing* ADA Amendments Act of 2008, Pub. L. No. 110-325, § 2(b)(5), 122 Stat. 3553.); *see also Neely*; 735 F.3d at 245; 29 C.F.R. § Pt. 1630, App., Section 1630.2(g).

Under the ADAAA, Congress broadened the definition of "regarded as" in two material ways. First, Congress removed the requirement that to be "regarded as" disabled, a plaintiff was required to prove that the employer entertained misperceptions that the plaintiff had an impairment that restricted his ability to perform a major life activity. *See* 42 U.S.C. § 12102(3)(A). Instead, Congress made clear that a plaintiff is "regarded as" disabled "if the individual established that he or she has been subjected to an action prohibited[4] under this chapter because of an actual or perceived physical or mental impairment[5] *whether or not the impairment*

---

[4] "Prohibited actions include but are not limited to . . . placement on involuntary leave, termination, [and] exclusion for failure to meet a qualification standard." 29 C.F.R. § 1630.2(*l*)(1).

[5] A physical or mental impairment is defined as:

(1) Any physiological disorder or condition, cosmetic disfigurement, or anatomical loss affecting one or more body systems, such as neurological, musculoskeletal, special sense organs, respiratory (including speech organs), cardiovascular, reproductive, digestive, genitourinary, immune, circulatory, hemic, lymphatic, skin, and endocrine; or

(2) Any mental or psychological disorder, such as an intellectual disability (formerly termed "mental retardation"), organic brain syndrome, emotional or mental illness, and specific learning disabilities.

25

*limits or is perceived to limit a major life activity*." *Id.* (emphasis added). As a result, a plaintiff is no longer required to prove that the employer subjectively believed he was disabled as defined under § 12102(1); rather, the plaintiff only had to show that the employer took a prohibited action against him because of an actual or perceived physical or mental impairment. *See id*; *see also* 29 C.F.R. § 1630.2(*l*)(1); *Parker v. Crete Carrier Corp.*, 839 F.3d 717, 724 (8th Cir. 2016) (quoting 42 U.S.C. §§ 12102(1)(C), 12112(a)). "The concepts of 'major life activities' and 'substantial limitation' simply are not relevant in evaluating whether an individual is 'regarded as having such an impairment.'" 29 C.F.R. § Pt. 1630, App. Section 1630.2(l). For this reason, "[w]here an employer bases a prohibited employment action on an actual or perceived impairment that is not 'transitory and minor,' the employer regards the individual as disabled, whether or not myths, fears, or stereotypes about disability motivated the employer's decision." *Id.*

Second, while Congress rejected the Supreme Court's narrow interpretation of "regarded as" in *Sutton*, it also explicitly reinstated the Court's "broad" interpretation of "regarded as" from *School Board of Nassau County v. Arline*, 480 U.S. 273 (1987). ADA Amendments Act of 2008, Pub. L. No. 110-325, § 2(b)(3), 122 Stat. 3553. In *Arline*, the Supreme Court held that a plaintiff who was terminated

---

29 C.F.R. § 1630.2(h)(1)-(2)

due to alleged safety concerns after her third relapse with tuberculosis was regarded as disabled because the employer took a prohibited action due to the "effects" of her condition. *Id* at 286.

The *Arline* Court highlighted that in 1974, Congress expanded the definition of "handicapped individual" under the Rehabilitation Act of 1973 to preclude discrimination against "[a] person who has a record of, or is regarded as having, an impairment [but who] may at present have no actual incapacity at all." *Arline*, 480 U.S. at 279. To the Court, the contagious effects of the plaintiff's disease could not be "meaningfully distinguished from the disease's physical effects on [the] claimant." *Id.* at 282. Indeed, both resulted from the same underlying condition, tuberculosis. *Id.* From the Court's perspective, "[i]t would be unfair to allow an employer to seize upon the distinction between the effects of a disease on others and the effects of a disease on a patient and use that distinction to justify discriminatory treatment." *Id.*

In finding that Arline was a covered individual, the Court hearkened back to the congressional purpose behind the inclusion of the "regarded as" language:

> By amending the definition of "handicapped individual" to include not only those who are actually physically impaired, but also those who are regarded as impaired and who, as a result, are substantially limited in a major life activity, Congress acknowledged that society's accumulated myths and fears about disability and disease are as handicapping as are the physical limitations that flow from actual impairment. Few aspects of a handicap give rise to the same level of public fear and misapprehension as contagiousness. Even those who suffer or have

recovered from such noninfectious diseases as epilepsy or cancer have faced discrimination based on the irrational fear that they might be contagious. The Act is carefully structured to replace such reflexive reactions to actual or perceived handicaps with actions based on reasoned and medically sound judgments: the definition of "handicapped individual" is broad, but only those individuals who are both handicapped *and* otherwise qualified are eligible for relief. The fact that *some* persons who have contagious diseases may pose a serious health threat to others under certain circumstances does not justify excluding from the coverage of the Act *all* persons with actual or perceived contagious diseases. Such exclusion would mean that those accused of being contagious would never have the opportunity to have their condition evaluated in light of medical evidence and a determination made as to whether they were "otherwise qualified." Rather, they would be vulnerable to discrimination on the basis of mythology—precisely the type of injury Congress sought to prevent.

*Id.* at 284-86 (emphasis in original).

With the ADAAA, Congress confirmed that the "broad view of the third prong of the definition of handicap under the Rehabilitation Act of 1973" applied to the "regarded as" standard under the ADA. ADA Amendments Act of 2008, Pub. L. No. 110-325, § 2(b)(3), 122 Stat. 3553. Therefore, following the passage of the amendments, "[c]overage under the 'regarded as' prong of the definition of disability should not be difficult to establish." 29 C.F.R. § Pt. 1630 App. Section 1630.2(l) (citing 2008 House Judiciary Committee Report at 17); *Eshleman v. Patrick Indus., Inc.*, 961 F.3d 242, 248 (3d Cir. 2020) (noting that "Congress did not expect to intend that this would be a difficult standard to meet.").

"To illustrate how straightforward application of the 'regarded as' prong is, if an employer refused to hire an applicant because of skin graft scars, the employer

28

has regarded the applicant as an individual with a disability." 29 C.F.R. § Pt. 1630, App. Section 1630.2(l); *see also E.E.O.C. v. LHC Grp., Inc.*, 773 F.3d 688, 701 (5th Cir. 2014) (reversing summary judgment because employer regarded plaintiff as disabled due to seizure disorder and subjected her to prohibited action as a result) (internal quotations omitted); *Nunies v. HIE Holdings, Inc.*, 908 F.3d 428, 434 (9th Cir. 2018) (finding a triable issue under the regarded-as prong where the employer effectively fired the plaintiff days after learning about his shoulder pain); *Cannon v. Jacobs Field Servs. N. Am., Inc.*, 813 F.3d 586, 591-92 (5th Cir. 2016); *Adair v. City of Muskogee*, 823 F.3d 1297, 1306 (10th Cir. 2016); *Mercado v. Puerto Rico*, 814 F.3d 581, 588 (1st Cir. 2016).

Similarly, "an employer who terminates an employee with angina from a manufacturing job that requires the employee to work around machinery, *believing that the employee will pose a safety risk to himself or others if he were suddenly to lose consciousness,* has regarded the individual as disabled." 29 C.F.R. § Pt. 1630, App. Section 1630.2(l) (emphasis added); *see also Equal Employment Opportunity Comm'n v. Amsted Rail Co., Inc.*, 280 F. Supp. 3d 1141, 1150 (S.D. Ill. 2017) (holding that "it is enough under the 'regarded as' prong to show that an employer took an action because it believed, rightly or wrongly, that [the employee] would be a safety risk."); *Mesa v. City of San Antonio by & through City Pub. Serv. Bd.*, No. SA-17-CV-654-XR, 2018 WL 3946549, at *13 (W.D. Tex. Aug. 16, 2018) (finding

29

that the EEOC's interpretative guidance "reflects the common-sense principle that if an employer takes adverse action because it fears the consequences of the employee's medical condition, it has regarded the employee as disabled.").

**b.    The record presents a triable issue whether Union Pacific regarded Meza as disabled under the ADAAA.**

Viewed in Meza's favor, the evidence raises a triable issue whether Union Pacific regarded Meza as disabled under the ADAAA.

On February 15, 2017, following his review of Meza's medical records, Dr. Charbonneau acknowledged that Meza "sustained a severe head injury including multiple skull fractures, intraparenchymal hemorrhagic contusions in the frontal and temporal lobes and a subdural hematoma with midline shift." App. Vol. 15, at 3240, R. Doc. 153-09 at 2; *see also* App. Vol. 11, at 2240, R. Doc. 150-22 at 63:1-5. "Due to the nature and severity of [Meza's] traumatic brain injury with intraparenchymal hemorrhagic contusions[,]" Dr. Charbonneau believed that Meza had an unacceptably high risk of future seizures, for a period of five years from the time of the TBI. App. Vol. 15, at 3242, R. Doc. 153-09, at 4; App. Vol. 15, at 3131, R. Doc. 153-04, at 180; *see also* App. Vol. 11, at 2276-77, R. Doc. 150-22, at 99:17-100:13, 107:20-108:6. Dr. Charbonneau believed that the areas of bleeding in Meza's brain were "altered chemically," and that was the source for the alleged increased risk for seizures in the future. App. Vol. 6, at 1135, R. Doc. 150-05, at 8. Because of that risk, Dr. Charbonneau imposed "sudden incapacitation restrictions for a period of

30

five years." App. Vol. 15, at 3242, R. Doc. 153-09, at 4; App. Vol. 15, at 3131, R. Doc. 153-04, at 180.

Dr. Holland later confirmed Dr. Charbonneau's opinion. App. Vol. 16, at 3245, R. Doc. 153-10, at 2. Like Dr. Charbonneau, Dr. Holland believed that Meza's severe head injuries posed an "unacceptably high risk of future seizures, for a period of five years from the time of the TBI" and imposed the work restrictions as a result. App. Vol. 16, at 3247-49, R. Doc. 153-11 at 2-4. According to Dr. Holland, Meza was at an increased risk for future seizures because he had "permanent damage" to his brain, including dead brain tissue and scarring. App. Vol. 10, at 2119-20, R. Doc. 150-21 at 134:6-135:11. For that reason, Dr. Holland signed a Railroad Retirement Board document certifying that "David Meza has been disabled from performing his/her regular occupation . . . due to . . . TBI – Skull Fx." App. Vol. 15, at 3145, R. Doc. 153-04 at 194.

As the Supreme Court recognized in *Arline*, there is no material distinction between Meza's brain injuries and the alleged safety-related concerns resulting from those same injuries. Union Pacific plainly admits that it imposed work restrictions on Meza because it believed his traumatic brain injuries posed an increased risk for future seizures. Under *Arline*, those admissions are more than sufficient to at least raise a fact issue whether Union Pacific regarded Meza as disabled.

Appellate Case: 24-1367   Page: 40   Date Filed: 06/14/2024 Entry ID: 5403709

Indeed, numerous courts have found a plaintiff was regarded as disabled under analogous circumstances. *See e.g., Finan v. Good Earth Tools, Inc.*, No. 4:06-CV-878-CAS, 2008 WL 1805639, at *2 (E.D. Mo. Apr. 21, 2008), *aff'd,* 565 F.3d 1076 (8th Cir. 2009) (upholding jury verdict because the plaintiff "presented evidence, albeit some of it disputed, that defendants placed [the plaintiff] on involuntary leave on account of his [seizure] condition, although he had been released to return to work."); *Sanders v. Union Pac. R.R. Co.*, No. 4:20-cv-3023, 2021 WL 4783629, at *8 (D. Neb. Oct. 7, 2021) (finding a reasonable jury could find that Union Pacific regarded the plaintiff as disabled because the railroad imposed work restrictions due to its belief that the plaintiff's stress test indicated he was a safety risk.); *Milligan v. Rambosk*, No. 220-cv-403-FtM-29MRM, 2022 WL 562342, at *6 (M.D. Fla. Feb. 24, 2022), *reconsideration denied*, No. 220-cv-403-FtM-29MRM, 2022 WL 910057 (M.D. Fla. Mar. 29, 2022) (denying summary judgment motion because the record was sufficient to allow a reasonable jury to conclude that the plaintiff was regarded as disabled when employer terminated the plaintiff because the muscle spasms caused by his impairment made him "not fit for duty and unsafe."); *E.E.O.C. v. Am. Tool & Mold, Inc.*, 21 F. Supp. 3d 1268, 1277 (M.D. Fla. 2014) (holding, as a matter of law, that the plaintiff was regarded as disabled because the employer withdrew its conditional employment offer after the plaintiff disclosed that he underwent a back surgery "several years prior."); *Cole v. Weatherford Int'l, LLC*, No. 14-CV-1115-

WJM-KMT, 2015 WL 3896835, at *6 (D. Colo. June 23, 2015) (finding a genuine issue of material fact because the evidence could establish that the employer terminated the plaintiff because he was considered a "high risk" due to a prior heart attack and back injury.); *Smart v. DeKalb Cnty., Georgia*, No. 1:16-CV-826-WSD, 2018 WL 1089677, at *9-10 (N.D. Ga. Feb. 26, 2018) (finding a genuine issue of material issues exists whether the defendant regarded the plaintiff as disabled because the defendant placed the plaintiff on "refrain from duty" status after he failed a CDL exam due to glaucoma and hypertension.); *Brasier v. Union Pac. R.R. Co.*, No. CV-21-00065-TUC-JGZ (MSA), 2023 WL 129534, at *3-5 (D. Ariz. Jan. 9, 2023), *report and recommendation adopted in part, rejected in part*, No. CV-21-00065-TUC-JGZ (MSA), 2023 WL 2754007 (D. Ariz. Mar. 31, 2023) (finding that a reasonable jury could conclude that plaintiff was fired due to "fears" about his medical condition when the railroad believed that, as a result of the plaintiff's brain surgery, the plaintiff had cognitive issues and was at increased risk of seizures.); *Andrews v. Koch Foods of Pine Mountain Valley, LLC*, No. 4:18-CV-16 (CDL), 2019 WL 13301152, at *7 (M.D. Ga. May 10, 2019) (finding a pregnant employee was regarded as disabled because the company believed she would be a safety risk due to the pregnancy); *Amsted Rail Co., Inc.*, 280 F. Supp. 3d at 1150; *Mesa*, 2018 WL 3946549, at *13.

The Eleventh Circuit's decision in *Lewis v. City of Union City, Georgia*, 934 F.3d 1169, 1181-82 (11th Cir. 2019) is particularly instructive. There, the Eleventh Circuit denied summary judgment because the police department removed a detective from duty because it believed that her past heart attack—albeit minor and causing no damage—created a dangerous risk of recurrence. *Id.* As the court noted, "the department's own stated reason for putting Lewis on leave—that it feared for her safety in view of her heart condition—demonstrates the department's belief that Ms. Lewis's medical condition set her apart from other police officers." *Id.* at 1181. Even if the court assumed the department's argument could somehow "divorce its placement of Ms. Lewis on administrative leave and her subsequent termination from any perception or belief that Ms. Lewis suffered from a physical impairment—and it is difficult to credit any such assumption—it could do no more than raise an issue of fact." *Id.* "A jury would be entitled to accept Ms. Lewis's evidence . . . and to conclude that the [department] put her on leave and fired her because it regarded her as disabled." *Id.* The court recognized that the department's "argument is nearly identical to one rejected by the interpretive guidance[,]" which, while not binding, "illustrates the common sense principle that an employer that takes an adverse action because it fears the consequences of an employee's medical condition has regarded that employee as disabled." *Id.* at 1182.

Similarly, in *Nall v. BNSF Ry. Co.*, 917 F.3d 335, 342-49 (5th Cir. 2019), the Fifth Circuit reversed summary judgment in favor of the railroad because its decision to remove an employee from service due to "safety concerns" related to his Parkinson's disease created material fact issues. *Id.* Concurring in the opinion, Judge Gregg Costa wrote: "in cases like this one that turn on whether the disability renders the employee a safety risk" there should be no "dispute about discriminatory intent." *Id.* at 350. After all, "[a]n employer cannot have it both ways by arguing that the termination was justified because the disability was dangerous while also maintaining that the safety-threatening disability was not the reason for the firing." *Id.* "When a concern about the disability's negative impact on workplace safety is the reason for the adverse action, the 'causation' element of an ADA discrimination claim should be straightforward." *Id.*

Like the employers in *Lewis* and *Nall,* Union Pacific removed Meza from work and imposed the work restrictions that resulted in the loss of his job because it feared that his traumatic brain injuries could cause him to be a safety risk. As such, Union Pacific regarded Meza as disabled. *See Arline,* 480 U.S. at 282-86; *see also Lewis,* 934 F.3d at 1181-82; *Nall*, 917 F.3d at 342-49. The only contestable issues are whether Meza can perform the essential functions of the job, and whether Union Pacific's decision to terminate Meza because of his disability was justified under the direct threat standard. *See Lewis*, 934 F.3d at 1182 (recognizing that whether an

35

employee is a safety risk is a separate inquiry to be addressed under the direct threat defense); *Nall*, 917 F.3d at 350; *Amsted Rail Co., Inc.*, 280 F. Supp. 3d at 1150; 29 C.F.R. § 1630.2(l)(3) (establishing that an individual was regarded as having an impairment does not, by itself, establish liability).

## II. The district court's contrary logic contradicts Congress's clear intent and distorts the regarded as definition beyond all recognition.

To dismiss Meza's claim, the district court disregarded Congress's clear intent and the straightforward disability analysis the ADAAA demands. Instead, the district court engaged in an overly complicated, cramped analysis of the regarded as element, exactly what Congress warned courts not to do. In the process, the district court fashioned a fictional distinction between Meza's traumatic brain injuries and the safety-related concerns that resulted from the same injuries, holding that even though Union Pacific acted based on its belief that Meza's brain injures posed an increased risk for seizure, that evidence did not establish that Union Pacific regarded Meza as having a physical or mental impairment. Add. 017-18, App. Vol. 17, at 3561-62, R. Doc. 162, at 17-18. Under the ADAAA, no such distinction exists.

The district court's analysis was error multiple times over. First, it relied on a flawed understanding of the regarded as element. Despite Congress's amendment to the ADA in 2008, the district court relied on a pre-amendment understanding of the regarded as element, improperly focused its analysis on Meza's personal view of his condition and drew the very distinction between a condition and its effects that was

36

rejected by Congress. Second, the district court's decision misapprehends the record. If the court had focused on what Union Pacific said, instead of zeroing in on Meza's own statements, it would have understood that Union Pacific placed restrictions on Meza because it believed whatever damage was done to his brain had a lasting impact. According to Union Pacific, it was that damage that caused Meza to have an increased risk for seizures. As a result, even under the district court's overly constrained analysis, Union Pacific regarded Meza as disabled. Third, the district court relied on *Morriss v. BNSF Railway Co.*, 817 F.3d 1104 (8th Cir. 2016), which addresses questions entirely divorced from the issues here, and cites to two district court opinions that repeat the same errors highlighted here. As such, the district court's opinion was error.

### a. The district court relied on a flawed understanding of the "regarded as" element.

The district court's decision reflects a fundamental misunderstanding of the "regarded as" element.

To begin, the district court claimed that "a person is regarded as disabled if [his] employer mistakenly believes that [he] has a physical impairment that substantially limits one or more major life activities or mistakenly believes that an actual, non-limiting impairment substantially limits one or more major life activities." Add. 012, App. Vol. 17, at 3556, R. Doc. 162, at 12. This language comes directly from the Supreme Court's decision in *Sutton,* which was expressly overruled

37

by the ADAAA Amendments. ADA Amendments Act of 2008, Pub. L. No. 110-325, § 2(b)(3), 122 Stat. 3553. Following the amendments, the concepts of "major life activities" and "substantial limitation" are not relevant to the regarded as analysis. 42 U.S.C. § 12102(3)(A); 29 C.F.R. § Pt. 1630, App. Section 1630.2(l).

Next, the district court based its analysis on statements by Meza and his treating providers, ignoring Union Pacific's direct admissions about the reasons it imposed the discriminatory restrictions. Add. 017, App. Vol. 17, at 3561, R. Doc. 162, at 17-18. To the district court, Meza's testimony that his brain injuries were no longer an issue and the unconditional work releases from his providers "doom[] his case." Add. 017-18, App. Vol. 17, at 3561-62, R. Doc. 162, at 17-18. But under the plain language of the ADA, the regarded-as analysis hinges on the *employer's* perception of the condition; the plaintiff's perception is completely irrelevant. *See* 42 U.S.C. § 12102(3)(A); *see also Canning v. Creighton Univ.,* 995 F.3d 603, 615 (8th Cir. 2021) (affirming summary judgment because the employee was unable to show "any genuine dispute of material fact as to whether Creighton (or its decisionmakers) regarded her as disabled . . . ."); *Am. Tool & Mold, Inc.*, 21 F. Supp. 3d at 1275 ("The relevant inquiry in such cases is not the plaintiff's actual condition, but how the Defendant 'perceived [his] condition, including the reactions and perceptions of the persons interacting with or working with him.'").

38

Third, the district court made the same illusory distinction rejected in *Arline*, *Lewis*, and *Nall*. To reach its decision, the district court fashioned a distinction between Meza's traumatic brain injuries and Union Pacific's safety concerns. *See* Add. 017-19, App. Vol. 17, at 3561-63, R. Doc. 162, at 17-19. To the district court, Union Pacific removed Meza from service due to the alleged risk that he could suffer sudden incapacitation in the future, and not his existing condition, and thus there was no evidence to demonstrate that Union Pacific "regarded" Meza as having a current impairment. *See* Add. 017-19, App. Vol. 17, at 3561-63, R. Doc. 162, at 17-19. However, as the *Arline*, *Lewis*, and *Nall* courts specifically recognize, the effects of an impairment are no different than the impairment itself. *Arline*, 480 U.S. at 282-86; *Lewis*, 934 F.3d at 1181-82; *Nall*, 917 F.3d at 342-49.

Finally, the district court's rationale subverts the very purpose of the ADAAA. According to the district court, anytime an employer acts on a supposed future risk, somehow distinct from a current impairment, that employer is immune from liability. This logic would apparently hold true regardless of whether the employer admits that it believed it was a then-existing impairment that posed a safety risk, as Union Pacific does here. Such a conclusion finds no support in the law and is directly contrary to the express intent of Congress under the 2008 Amendments.

What is more, the district court's analysis entirely relieves the employer of having to prove that its claimed safety concerns satisfy the direct threat standard.

39

Under the district court's analysis, an employer need only *claim* that the decision was based upon a safety risk; and that *claim* alone defeats the regarded as analysis. The employer need not present evidence that its asserted risk is significant, that the potential harm was substantial, or that it satisfied any of the other requirements of the direct threat standard, such as proving that its decision was based a reasonable medical judgment that relied on the most current medical knowledge and/or on the best available objective evidence. *See* 42 U.S.C. § 12111(3); 29 C.F.R. 1630.2(r).

The fact that the district court never even addressed the direct threat burden proves the point. At the time of its decision, Union Pacific specifically claimed that it was removing Meza from service because it believed that his medical conditions posed a significant risk for future harm. App. Vol. 15, at 3130-31, R. Doc. 153-04, at 179-80; App. Vol. 15, at 3241-42, R. Doc. 153-09, at 3-4. Despite this assertion, the district court never even addressed the direct threat burden, finding instead that Meza's claim could not get out of the starting blocks because Union Pacific did not regard him as disabled.

As such, the district court's regarded-as analysis produces an absurd result, and should be reversed. *See United States v. Turkette*, 452 U.S. 576, 580 (1981) (holding that when interpreting the scope of a statute, "absurd results are to be avoided."); *United States v. Fitzgerald*, 906 F.3d 437, 447 (6th Cir. 2018) ("[C]ourts

should not construe a statute to produce an absurd result that we are confident Congress did not intend[.]") (internal quotations omitted).

### b. The district court ignored Union Pacific's admissions and drew inferences from the record in Union Pacific's favor.

In its decision, the district court bypassed Union Pacific's plain admissions that it regarded Meza as having a current impairment and instead drew any inferences from the record in Union Pacific's favor.

At summary judgment, the district court must view the record in the light most favorable to the non-moving party and must give that party "the benefit of all reasonable inferences that may be drawn from the evidence." *Maitland v. Univ. of Minn.*, 155 F.3d 1013, 1015 (8th Cir. 1998). "A fact is material if it might affect the outcome of the suit, and a dispute is genuine if the evidence is such that it could lead a reasonable jury to return a verdict for either party. *Huggins v. Stryker Corp.*, 932 F. Supp. 2d 972, 984 (D. Minn. 2013) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Anderson*, 477 U.S. at 355. A district court's failure to draw all reasonable inferences in the non-movant's favor is clear grounds for reversal. *Wealot,* 865 F.3d at 1128 (reversing grant of summary judgment because "[d]isputed factual issues and conflicting testimony should not be resolved by the district court.").

41

As explained above, Dr. Charbonneau and Dr. Holland admitted that they imposed work restrictions because they believed Meza's traumatic brain injuries placed him at an increased risk for seizures. App. Vol. 15, at 3131, R. Doc. 153-04, at 180; App. Vol. 15, at 3242, R. Doc. 153-09, at 4; App. Vol. 16, at 3247-49, R. Doc. 153-11, at 2-4. According to Dr. Holland, Meza was "disabled" from performing his job, and his traumatic brain injuries included current impairments, such as scarring and dead brain tissue. App. Vol. 15, at 3145, R. Doc. 153-04 at 194; App. Vol. 10, at 2119-20, R. Doc. 150-21 at 134:6-135:11. These admissions should have alone been sufficient to deny Union Pacific's motion for summary judgment. *Lewis* 934 F.3d at 1181-82; *Nall*, 917 F.3d at 342-49.

The district court, however, overlooked this evidence, choosing instead to view the record in Union Pacific's favor. For example, the district court claimed that "there was undisputed evidence that Meza faced a greater risk of seizures after his brain injury and that Union Pacific acted based on that risk," but concluded that such an admission was "not necessarily probative evidence [to] support [Meza's] assertion that Union Pacific thought he was disabled when it imposed the work restrictions on him." Add. 017-18, App. Vol. 17, at 3561-62, R. Doc. 162, at 17-18.

In fact, this very evidence proves perceived disability. For Meza to have an increased risk for seizures, the traumatic brain injuries must have left a lasting impairment on his brain. Without a lasting impact, Meza's brain was "normal," and

Appellate Case: 24-1367    Page: 51    Date Filed: 06/14/2024  Entry ID: 5403709

his risk for future seizures would be the same as the rest of the general population. For that reason, Union Pacific's belief that Meza's injuries posed an increased risk for seizures and necessitated on-going work restrictions raises a clear inference that Union Pacific believed Meza had a current impairment. This clear inference was entirely ignored by the district court.

### c. The district court's reliance on *Morriss* and *Jackson* is misplaced.[6]

In its summary judgment decision, the district court relied on two cases to support its conclusion that Meza was not regarded as disabled, *Morriss v. BNSF Railway Co.*, 817 F.3d 1104 (8th Cir. 2016) and *Jackson v. Union Pac. R.R.*, No. 419-cv-00069-RGE-RAW, 2021 WL 1726895 (S.D. Iowa Mar. 29, 2021). For different reasons, each case is not persuasive.

Let's begin with this Court's decision in *Morriss*. In *Morriss*, the Court addressed the question of "whether obesity qualifies as a disability under the ADA," and more precisely, whether obesity qualifies as a "physical impairment." 817 F.3d at 1107-08. After a thorough analysis, the Court concluded that a person's weight, by itself, is a physical characteristic. *Id.* at 1112. Thus, for obesity (even morbid

---

[6] As referenced, the district court also relied on the decision in *Bingham v. Union Pac. R.R.*, No. 8:22-CV-118, 2023 WL 6196875, at *13 (D. Neb. Sept. 22, 2023). Because the *Bingham* court primarily relied on the decisions in *Morriss* and *Jackson* to find that the plaintiff was not regarded as disabled, the *Bingham* decision is inapplicable and error for the same reasons as *Morriss* and *Jackson*, and is not separately addressed here.

43

obesity) to be considered a physical impairment, "it must result from an underlying physiological disorder or condition." *Id*.

After concluding that obesity by itself was not a physical impairment, the Court addressed Morriss's argument that BNSF discriminated against him because it "perceived him as having a physical impairment." *Id.* at 1113. To Morriss, BNSF perceived him to have a current impairment because it considered his obesity to present an unacceptably high risk that he would develop future medical conditions. *Id.* Relying on its earlier determination that obesity was not a physical impairment, the Court held that "the ADA does not prohibit discrimination based on a perception that a physical characteristic—as opposed to a physical impairment—may eventually lead to a physical impairment." *Id.* For that reason, the Court held that BNSF did not perceive Morriss to have a physical impairment. *Id.*

The facts of *Morriss* are easily distinguishable. Unlike the plaintiff in *Morriss*, Meza makes no argument that Union Pacific removed him from service because of his weight or because of suspected obesity. For that reason, the question answered by the *Morriss* decision is irrelevant to the present claims.

What is more, contrary to the allegation raised in *Morriss*, Meza does not allege that Union Pacific perceived him as disabled because of a risk of developing some unspecified *future* impairment. Instead, Meza alleges that Union Pacific perceived him to have a current physical or mental impairment (traumatic brain

44

injuries and hemorrhages that caused permanent damage to his brain) and believed those impairments posed an unacceptably high risk for future seizures. The risk of developing some unspecified condition in the future is different than the risk of a seizure from past brain surgery. Meza had the latter, and according to Union Pacific, it was a then-existing injury to his brain that created the increased risk for seizures. The *Morriss* case has no application here.[7]

The district court's reliance on *Jackson* is equally flawed. In *Jackson*, the court held that Union Pacific's decision to issue work restrictions because it believed that the plaintiff's stroke created an increased risk for sudden incapacitation did not raise a fact question whether Union Pacific regarded the plaintiff as disabled. *Id.* at 14. To reach its conclusion, the *Jackson* court fashioned the same fictional distinction between an impairment and its effects that dooms the district court's decision in this case. *See Arline*, 480 U.S. at 282-86, *Lewis,* 934 F.3d at 1181–82, *Nall*, 917 F.3d at 342-49.

In addition, the *Jackson* court's conclusion relied on two other district court opinions, *Fischer v. Minneapolis Pub. Sch.*, 792 F.3d 985, 988 (8th Cir. 2015) and *Watt v. City of Crystal*, No. 14-cv-3167 (JNE/JJK), 2015 WL 7760166, at *5 (D.

---

[7] The same is true for the other authority cited by the district court that held that the ADA does not cover a situation where an employer views an employee as a risk for developing a future impairment. *See* Add. 015, App. Vol. 17, at 3559, R. Doc. 162, at 15 (citing cases).

45

Minn. Dec. 2, 2015), which fail to supports its analysis. *Fischer* and *Watt* stand for the uncontroversial proposition that there is a difference between an employer's perception that the employee has an impairment and an employer's perception that an employee does not have the qualifications to perform the job. *Fischer*, 792 F.3d at 989; *Watt*, 2015 WL 7760166, at *5.

The factual circumstances in *Fischer* and *Watt* stand in stark contrast to the facts in *Jackson* and the facts here. Whereas in *Fischer* and *Watt* the employer's belief about the employee's qualifications was untethered to physical or mental impairment, Union Pacific's decisions to impose work restrictions in *Jackson* and here are directly tied to a perceived physical or mental impairment—stroke in *Jackson* and traumatic brain injuries here. Therefore, the *Jackson* court's conclusion not only contradicts Congress's intent, but lacks support from the very decisions it claims warrant its conclusion.

## CONCLUSION

In 2008, Congress amended the ADA to specifically protect employees like Meza and to prohibit employers like Union Pacific from discriminating against employees due to their actual or perceived medical conditions. The district court bypassed Congress's clear intent and ignored the evidence in this case that demonstrated that Union Pacific regarded Meza as disabled, or, at the very least, raised a material fact question. The district court's decision should be reversed.

46

Respectfully submitted,

s/Lucas J. Kaster
James H. Kaster
Lucas J. Kaster
NICHOLS KASTER, PLLP
4700 IDS Center
80 S. 8th Street
Minneapolis, MN 55402
(612) 256-3200
kaster@nka.com
lkaster@nka.com

Dated: June 13, 2024            *Counsel for Plaintiff-Appellant*

47

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because this brief contains 11,475 words excluding the parts of the brief exempted by Rule 32(f). This brief complies with the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because this brief has been prepared in proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font. This brief and the corresponding addendum comply with the virus scan requirements required by Local Rule 28A(h)(2) and is virus-free.

Dated: June 13, 2024        s/Lucas J. Kaster
                                      Lucas J. Kaster

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on June 13, 2024, I electronically filed the foregoing brief with the Clerk of the Court for the U.S. Court of Appeals for the Eighth Circuit by using the CM/ECF system. All participants are registered CM/ECF users and will be served by the appellate CM/ECF system.

<u>s/Lucas J. Kaster</u>
Lucas J. Kaster

Appellate Case: 24-1367    Page: 58    Date Filed: 06/14/2024 Entry ID: 5403709